SHEFFLER MERCHANDISE CO., INC. *v.* UNITED STATES (No. 4575) [1]

---

[1] C. A. D. 372.

United States Court of Customs and Patent Appeals, November 29, 1947

*John D. Rode* for appellant.

*Paul P. Rao*, Assistant Attorney General (*Alfred A. Taylor, Jr.*, special attorney, of counsel), for the United States.

[Oral argument October 7, 1947, by Mr. Rode and Mr. Taylor, Jr.]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate-Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Second Division, overruling the protest of the importer against the classification by the Collector of Customs at the port of New York City of merchandise invoiced as "celluloid thumb tacks."

Samples representative of the merchandise were introduced in evidence. The finished article is composed of two pieces of iron or steel, one being a small flat head and the other a short pointed stem, the top end of which is inserted in the head, the two pieces being secured together. The metal head piece is covered by a cap. The material of which the cap is composed is not definitely identified but it is non-metallic and is most frequently referred to throughout the record as celluloid. There is testimony indicating that a plastic may be used if desired. The particular articles represented by the samples before us are of small size. The pointed stem is approximately $\frac{5}{8}$ of an inch in length and perhaps $\frac{1}{50}$ of an inch in diameter. The flat metal head is $\frac{1}{4}$ of an inch in diameter. It is understood that the nonmetallic caps which cover the metal head may be of different colors, and it was testified that the samples were "known as $\frac{3}{8}$ of an inch head." Incidentally, it may be said that it was testified that the caps make up $33\frac{1}{3}$ per centum of the value of the article.

The brief on behalf of appellant, basing the statement on the testimony, describes the process of manufacturing the articles abroad (the witness had never seen them manufactured in this country) as follows:

* * * The heads are die-stamped from large steel sheets. Another die stamps out the holes in the center of the heads. An automatic machine, with a roll of wire on one side and a container of heads on the other, then forces the wire into the head, cuts off the stem and at the same time sharpens or presses the stem. Thereafter a celluloid cap is put over the head of the thumb tack.

There is no definite testimony as to the use of the articles but in answer to the question, "What purpose does the colored covering [the celluloid cap] of the head serve?", appellant's witness, who was the importer, stated:

It serves the same purpose as the brass [it appears that there are some thumb tacks, or at least head caps made of brass] but for decorative purposes besides using as a pin to fasten the item, it [the cap] is used for decorative purposes. Also, it protects the pin from going through the head because in many cases, a lot of people will not buy a brass-headed thumb tack.

There is no question but that it is the practice to insert the articles where desired by pressing them with the thumb or finger. So far as disclosed they are never driven.

The Collector of Customs classified the merchandise under the clause of paragraph 331 of the Tariff Act of 1930, reading "thumb tacks, of two or more pieces of iron or steel, finished." The rate of duty originally provided in the act was 3 cents per pound but by virtue of a presidential proclamation promulgated in the latter part of 1932 under the flexible tariff provision of the act (T. D. 46051, 62 Treas. Dec. 676) the rate was increased by 1½ cents per pound so that in this case the collector levied duty at the specific rate of 4½ cents per pound.

The importer's protest (without specifically defining what it claimed the merchandise to be except that it fell under paragraph 331) recited several different rates which were claimed in the alternative. Among them was a claim "at 9/10c per lb. under Par. 331 as amended by T. D. 46051," and appellant finally relied solely upon this claim before the Customs Court, and relies upon it here. Its brief before us which refers to the articles as thumb tacks asserts that the provision of the paragraph under which they are properly classifiable is that which reads:

* * * spikes, tacks, brads, and staples, not specially provided for * * *.

The foregoing is in the last clause of paragraph 331. In view of the issue involved and the discussion of the trial court and counsel for the respective parties we quote paragraph 331 as it originally passed. The provisions particularly involved here are italicized:

PAR. 331. Cut nails and cut spikes, of iron or steel, exceeding two inches in length, four-tenths of 1 cent per pound; cut tacks and brads, hobnails and cut nails, of iron or steel, not exceeding two inches in length, 15 per centum ad valorem; horseshoe nails, and other iron or steel nails, not specially provided for, 1½ cents per pound; *upholsterers' nails, chair glides, and thumb tacks, of two or more pieces of iron or steel, finished or unfinished*, 3 cents per pound; nails, spikes, tacks, brads, and staples, made of iron or steel wire, not less than one inch in length nor smaller than sixty-five one-thousandths of one inch in diameter, four-tenths of 1 cent per pound; less than one inch in length and smaller than sixty-five one-thousandths of one inch in diameter, three fourths of 1 cent per pound; staples, in strip form, for use in paper fasteners or stapling machines, 2 cents per pound; *spikes, tacks, brads, and staples, not specially provided for* six tenths of 1 cent per pound.

Paragraph 331 of the Tariff Act of 1930 is substantially the same as paragraph 331 of the 1922 act with two exceptions. First, the 1922 act did not contain the *eo nomine* provision for upholsterers' nails, chair glides, and thumb tacks. This provision we find was

included in the bill H. R. 2667, 71st Congress (which matured into the Tariff Act of 1930) at the time the bill was introduced in the House. Second, the specific provision for "staples, in strip form," was not in the act of 1922. It was inserted in the Senate, while the bill H. R. 2667 was under consideration in that body, and agreed to in conference between the two Houses. This item has no relevancy here.

It is observed that the term "tacks" appears four times in paragraph 331; that is "cut tacks * * *," "thumb tacks * * *," "tacks * * * made of iron or steel wire," and "tacks * * * not specially provided for * * *."

Such dictionaries, published about 1930, as we have examined treated thumb tacks and tacks as different things. For example, Webster's New International Dictionary, 1930 edition, defines "thumb tack" (using two words not hyphenated as does the statute, *supra*) as—

A short steel point with a broad flat head, for pressing into a board by the thumb, as to secure a sheet of drafting paper.

At another place in the book the same authority gives various definitions of the term "tack," that most pertinent here being:

A small, short, sharp-pointed nail, usually having a broad flat head.

The 1911 edition of the Century Dictionary and Cyclopedia hyphenates the words "thumb" and "tack" and defines the hyphenated word as:

A tack with a large flat head, designed to be thrust in by the pressure of the thumb or a finger.

At another place the term "tack" is defined as:

A short, sharp-pointed nail or pin, used as a fastener by being driven or thrust through the material to be fastened into the substance to which it is to be fixed.

It may be remarked that in the record and briefs of the instant case the words "thumb" and "tack" are several times consolidated into the one word "thumbtack" without being hyphenated.

Of course, there are many varieties of tacks of which we may take judicial notice—carpet tacks, basket tacks, shoe tacks, etc.—and one way these are distinguishable in fact from thumb tacks, of which there are different types, is that the former are driven into place with a hammer or like tool while the latter are pressed into place by the thumb or finger.

It is obvious from the description of the merchandise that in a broad sense it falls within the quoted dictionary definition of thumb tack. Appellant contends, however, that it may not be classified as thumb tack of two or more pieces of steel, finished, because of the celluloid cap which is imposed upon the metal head.

The decision of the trial court quotes at some length from the report

of the United States Tariff Commission upon which the presidential proclamation, T. D. 46051, *supra*, was predicated. We take the liberty of repeating a part of the matter so quoted.

The investigation as ordered by the commission [1] embraces all upholsterers' nails, chair glides, and thumb tacks, finished or unfinished, dutiable under paragraph 331 of the tariff act of 1930. These include the following articles when made of two or more pieces of iron or steel: (1) Upholsterers' nails, (2) 1-prong chair glides, and (3) thumb tacks. They also include (4) 1-piece thumb tacks of iron or steel, and (5) thumb tacks in chief value of other materials.

  *   *   *   *   *   *   *

Thumbtacks are polished, plated, enameled, or covered with celluloid. These *finishing* processes are automatic. [Italics supplied by trial court.]

  *   *   *   *   *   *   *

Five general types of thumb tacks are imported and represent 74 per cent of the total imports. The five types are as follows:

1. The "gura" tack, brass-plated, with shank riveted to head.  *  *  *
2. The "rodi," a gura tack with brass-plated cap crimped over the head of the tack.
3. The celluloid covered tack, a gura tack with a celluloid cap.
4. The solid-head tack.
5. The 1-piece or cut-out tack.

*  *  *  One type of celluloid tack offered for sale by a domestic producer is an imported gura tack capped with celluloid in the United States before being sold.  *  *  *

It will be observed that no tacks other than thumb tacks were investigated by the Tariff Commission, the only other articles named in the paragraph investigated being upholsters' nails and chair glides, and the presidential proclamation provided:

An increase in the rate of duty expressly fixed in paragraph 331 of Title 1 of said act on upholsterers' nails, chair glides, and thumb tacks, of two or more pieces of iron or steel, finished or unfinished, from 3 cents per pound to 4½ cents per pound; and

An increase in the rate of duty expressly fixed in paragraph 331 of Title 1 of said act on thumb tacks, not specially provided for, from six-tenths of 1 cent per pound to nine-tenths of 1 cent per pound.

From all the foregoing it is obvious that the United States Tariff Commission, notwithstanding the seeming treatment by lexicographers of thumb tacks and tacks as being distinctive articles, was of opinion that, for tariff purposes, there are types of thumb tacks other than those specified *eo nomine* in paragraph 331, *supra*, which are classifiable under that paragraph, such types being not specially provided for. The report gives, as examples, *one-piece* thumb tacks and thumb tacks in chief value of other materials, meaning by the latter, as we understand it, in chief value of materials other than the iron or steel in the thumb tacks described in the paragraph.

Neither the report of the Tariff Commission, nor the President's

---

[1] It appears that the investigation was ordered and made by the Tariff Commission upon the application of United States manufacturers duly and properly filed in conformity with section 336 (a) (4) of the Tariff Act of 1930. and the rules formulated thereunder.

proclamation specified any particular clause of the paragraph which they thought covers such *thumb tacks* as are not specially provided for, but for the purposes of this case we assume, as appellant contends, and as the court below obviously felt, that if they do not fall within the collector's classification they are classifiable as "tacks not specially provided for" dutiable at nine-tenths of 1 cent per pound.

Appellant's contention may be said to be predicated upon the fact that the metal heads of the finished imported articles involved have the nonmetallic cap covers, which covers constitute an integral part of the finished product. We quote the following from its brief (omitting references to pages of the record):

The imported thumb tacks are neither fully nor accurately described by the words "of two or more pieces of iron or steel" because they are made of two pieces of steel and one piece of celluloid, or non-metallic substance * * * . Furthermore this additional material is not negligible in value, but results in an increase in price of thirty-three and one-third per cent * * * . Entirely apart from this difference in cost, it is clear that the added material has a functional difference in that it is both decorative and serves to protect the pin from going through the head.

It is urged that the words "of two or more pieces of iron or steel" are words of limitation—not extension, and there are speculations or assertions as to what the proper holding would be if the tariff provision read merely "thumb tacks"; "thumb tacks, wholly or in chief value of metal"; "thumb tacks wholly or in chief value of iron or steel," and other variations unnecessary to be enumerated. The speculations or assertions so made are, we take it, for illustrative purposes, but as a matter of fact we do not find them of any particular aid in construing the provision.

The trial court cited the decision of this court, including its numerous citations, in the case of *United States* v. *Guy B. Barham Co., For University Shoppe*, 26 C. C. P. A. (Customs) 83, T. D. 49614, wherein we said:

It is well settled that the general rule is that when a tariff statute provides for "an article of specified material, without declaring to what extent it must be composed of that material, it is at least confined to merchandise of which the specified material is that of chief value or is the predominant one therein," and the words "composed of," "made of," and "kindred expressions" in tariff statutes may, according to the context, mean wholly or substantially wholly of a specified material, or wholly or in chief value of such material. *Vantine & Co.* v. *United States*, 3 Ct. Cust. Appls. 488, T. D. 33124; *Kenyon Co.* v. *United States*, 4 Ct. Cust. Appls. 344, T. D. 33529; *Blumenthal & Co. et al.* v. *United States*, 5 Ct. Cust. Appls. 327, T. D. 34529; *Steinhardt & Bro.* v. *United States*, 8 Ct. Cust. Appls. 372, T. D. 37629; *Simiansky & Co.* v. *United States*, 9 Ct. Cust. Appls. 288, T. D. 38224; *United States* v. *Kalter Mercantile Co. et al.*, 11 Ct. Cust. Appls. 540, T. D. 39680, *United States* v. *Linen Thread Co.*, 13 Ct. Cust. Appls. 359, T. D. 41257.

As a conclusion from the authorities so cited, the trial court stated:

In accordance with the above-mentioned authorities, it would appear that the general rule applicable in construing a tariff statute which provides for an article

of specified material, without declaring to what extent it must be composed of that material, is that it must at least be confined to merchandise of which the specified material is that of chief value or the predominant one therein.

Counsel for appellant takes the view that our decision in the *Barham* case, *supra*, constitutes a precedent favorable to appellant in the instant controversy, his brief saying:

Actually the decision of this court in the *Barham* case is persuasive if not controlling of the issue in the instant case.

We think the cases are clearly distinguishable and do not regard the *Barham* case, *supra*, as being a precedent favorable to appellant's contention in this case.

The merchandise there involved consisted of "spun yarn of rayon and cotton, plied, consisting substantially of rayon, the percentages being 80 percent rayon and 20 percent cotton"; that is to say, the product was a mixture of materials, rayon and cotton, rayon being the material of chief value. The trial court, reversing the collector's classification, held it classifiable under paragraph 1303 of the Tariff Act of 1930, which provided for "Spun yarn of rayon or other synthetic textile * * * plied, * * * " apparently because the rayon was the material of chief value.

It will be observed that the spun yarns defined in that paragraph are not mixtures of materials.

This court, for reasons quite fully stated, took the view that the merchandise fell within the provisions of paragraph 1312 of the act. and was properly assessed thereunder by the collector, because a substantial portion of it consisted of cotton. In other words, although the rayon element was the element of chief value in the yarn it was not composed wholly or substantially wholly of rayon. It was our view and we held, as expressed in the second headnote of the decision, that "the provision in paragraph 1303 for spun yarn was intended. to be limited to such as was composed *wholly* or *substantially* wholly (italics quoted) of rayon or other synthetic textile." That is to say, the construction of paragraph 1303 (which does not mention chief value) is not governed by chief value, as is paragraph 1312 which specifically mentions it.

With respect to the merchandise here involved, the trial court said:

The provision in issue herein, paragraph 331, *supra*, does not disclose to what extent the involved thumbtacks must be composed of iron or steel, but simply provides for "thumb tacks, of two or more pieces of iron or steel." Thus, there is nothing in the phraseology which requires that the words "two or more pieces of iron or steel" be interpreted as meaning *substantially wholly* of iron or steel. Consequently, said provision should be interpreted to mean wholly *or in chief value* of iron or steel and we so hold.

It is our view that under the authorities cited in the quotation hereinbefore made from the *Barham* case, *supra*, the trial court correctly construed the paragraph.

The anomalous situation which would result from sustaining appellant's protest is the subject of comment by the trial court, and it is frankly conceded by counsel for appellant that the result would be anomalous.

Every rate of duty named in paragraph 331, *supra*, except one ad valorem rate, is specific, and that fixed upon the thumb tacks described therein is the highest rate named in the paragraph as originally enacted—3 cents per pound. As heretofore has been stated, the specific provision for thumb tacks appearing in the 1930 act did not appear in paragraph 331, *supra*, the corresponding paragraph of the Tariff Act of 1922. We do not know how such tacks, if any were imported, were classified under the 1922 act, but it is a fair assumption that they were classified under one of the "tack" clauses of paragraph 331. Obviously, the 71st Congress concluded that there should be a higher rate of duty upon "two piece" thumb tacks of iron or steel, and so provided. Furthermore, even the rate fixed by Congress was found upon investigation to be insufficient to (we quote from the President's proclamation) "equalize the differences in the costs of production of the domestic articles and the like or similar foreign articles when produced in said principal competing country," and the rate was raised to 4½ cents per pound, the full increase allowed by the statute.

It is difficult to conceive that the Congress intended that adding a celluloid-like cap to a two piece thumb tack, upon which it was trying to raise the duty, which cap actually added to the value of the whole although it did not become the element of chief value, should result in fixing the tariff status of the article as dutiable at a rate lower than that upon a number of articles in the paragraph, the rate of duty upon which Congress did not raise, nor offer to raise.

Of course, anomalies sometimes do appear in legislation which cannot be prevented or remedied by judicial decree since the courts are not authorized to legislate, but we do not think any anomaly was, in fact, created here.

Certainly there is no new or strained construction of law in the holding that the classification of two-piece thumb tacks, such as those here involved, is governed by the element of chief value of the materials entering into their structure.

While the phrase of "two or more pieces of iron or steel" may in a sense be regarded as words of limitation, we do not regard them as such in the sense for which appellant contends. A thumb tack composed of a single piece, for example, would not seem to fall within the phrase, but the addition of a finishing part made of a material other than iron or steel, unless it becomes the element of chief value, does not, in our opinion, serve to remove the finished article from the clause.

The judgment of the Customs Court is *affirmed*.